[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a contested dissolution of marriage in which the major legal issue was how to treat passive appreciation of assets during the pendency of the dissolution action using the following statutory criterion: "The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in the value of their respective estates." General Statutes § 46b-81(c).
This court, having heard the testimony, reviewed the evidence and considered the claims of law and fact, finds as follows: The plaintiff wife and the defendant husband were married in Norwalk, Connecticut on June 17, 1967. Both parties have resided in the state of Connecticut for more than one year immediately preceding the date of the filing of the complaint. Neither party has received assistance from the state of Connecticut. There were three children issue of the marriage. Two children have attained majority. The third child, Anne G. Bepler, was born March 12, 1982. No other children have been born to the plaintiff since the date of the marriage.
At the commencement of the trial the parties entered into the following oral stipulation:
1. There are no issues of custody or visitation.
2. The marriage has broken down irretrievably. CT Page 10103
3. Neither party will offer evidence or witnesses as to the causes for the dissolution of the marriage. General Statutes §§ 46b-40(c) 46b-81(c) and46b-82.
4. The fair market value of the three parcels of real estate have been agreed upon.
At the conclusion of the evidence the court concluded that the parties abided by the terms and the conditions of this stipulation.
The court found that there were few facts in dispute. The major dispute was the disposition of the substantial assets in this thirty-one year marriage. The parties have three children, issue of the marriage. The oldest child, a daughter, graduated from Boston College in 1995. She lives in Montana and supports herself. The second child, a boy, graduated from the University of Connecticut in 1998. He has a full-time job in Nashville, Tennessee thereby supporting himself: The third child, a minor daughter, lives in the marital home in Darien, Connecticut. She just completed her sophomore year at Loomis-Chaffe School, Windsor, Connecticut. The parties have agreed as to joint custody of Anne and reasonable access while she is with the other parent. She will continue to live with the plaintiff. None of the children have any health problems. The parties separated in March, 1997. The defendant vacated the family home at 246 Brookside Road, Darien and moved into his own residence at 1 Getner Trail, Norwalk, Connecticut.
The plaintiff wife is 54 and in good health. She attended Connecticut College and spent her junior year abroad in Italy. When she returned from her junior year she entered Columbia University. After receiving her B.A. degree she obtained an administrative job at Bloomingdale's headquarters. She left Bloomingdales' shortly thereafter and worked at Citibank until the birth of their first child in March, 1973. The parties moved to Los Angeles due to the defendant's employment. While there, in 1977, she obtained employment with Crocker National Bank as a personal banker working in the Latin-American client department. She left Crocker National Bank because the parties moved to New York in September, 1979. She then worked for a New York City subsidiary of Crocker National Bank. In June, 1980, she gave up that position. It was the end of a school year, and she had to attend to the needs of their two children, then 4 and 7. In CT Page 10104 March, 1981, she became employed by the Bank of New York in New York City as Assistant Vice President in the personal banking department. She took maternity leave in early 1982. This was her last job outside the house. There was insufficient evidence of the plaintiff's earnings. From the evidence produced, the court concludes that from 1967 to 1982 the plaintiff used her earnings for family purposes.
The plaintiff testified about the following 1982 employment factors: (1) she had three children at home which required her to become a full time housekeeper, (2) the commute to New York from their Darien home was difficult, (3) her take home earnings were minimal after payment of a full-time housekeeper and Federal, New York and Connecticut taxes, (4) the parties both talked about her leaving employment and (5) the defendant suggested that she quit her job. The defendant testified that he was neutral about her leaving employment. He testified that he pointed out the disadvantages of her job, and the plaintiff made the decision not to be employed after 1982.
The defendant husband is 55 and in good health. He obtained his undergraduate degree in 1964 from Fordham University and received an MBA in Finance and Accounting from Columbia University in 1966. He had no further formal education. Immediately after receiving his MBA he became employed with an investment banking firm in New York City where he worked for over a year. He then worked for the Bank of America Internationals in New York for two years, then for Clarke Dodge as a research analyst for four plus years. In October, 1972, he was hired by Capital Research Company, his current employer. Capital Research is a subsidiary of Capital Group, Inc. an investment research firm specializing in foreign and domestic equities. Capital Research manages over $250 billion in assets in 33 separate mutual funds. He has been researching equities since 1972 for Capital Research. His research duties expanded in 1976 when he started to manage some diversified portfolios. He is a Senior Vice President and portfolio manager of four mutual funds.
At the time of the marriage the defendant had $1,000 in savings, a half interest in an automobile, and he owed student loans. The plaintiff owned 100 shares of ATT, an inheritance from her grandmother. She had no debts and no other assets. During the marriage neither party received an inheritance. The only gift received by either party was $6,000 from the plaintiff's parents so the parties could purchase their first CT Page 10105 home. At the time of the marriage she was employed at Bloomingdales and he at his first job with the investment banking firm.
The parties have lived in eight homes during their marriage. They rented three apartments in New York City. After the birth of the first child, the plaintiff moved to her parent's home in Colebrook, Connecticut for the summer for health reasons just prior to the Los Angles move and the defendant lived with his brother. The separation was not due to any marital discord. The fifth home was a rental half duplex in Los Angeles. The sixth was a home in Los Angles purchased by the parties for $125,000. The defendant made a $10,000 down payment. The defendant's father loaned an additional $10,000, and collateralized stock as additional security for the loan. The balance was paid by a first mortgage. The seventh house was a $280,000 co-op in New York City. The defendant borrowed the co-op down payment from Capital Group, Inc. This company loan along with his father's $10,000 loan for the Los Angeles home purchase was paid off when the co-op was sold in 1981 for $775,000. The sale proceeds were used to purchase the current marital home in Darien.
The marital home at 246 Brookside Road, Darien Connecticut was purchased in May, 1981 for $475,000. The parties have stipulated that the current fair market value of 246 Brookside Road, Darien, Connecticut is $2,600,000. It is encumbered by an existing $700,000 first mortgage. Although the plaintiff and minor child still live in the marital home, the defendant lives at 1 Getner Trail, Norwalk, Connecticut which he brought in January, 1997, for $389,500. The parties have stipulated that the current fair market value of 1 Getner Trail, Norwalk, Connecticut is $429,900. It is not encumbered by a mortgage. The parties own a vacation home at 7 Old Harbor Lane, Chatham, Massachusetts. They have stipulated that the fair market value of 7 Old Harbor Lane, Chatham, Massachusetts is $406,000. It is not encumbered by a mortgage.
The defendant also owns an interest in a limited partnership known as Homestead Associates LLC, which in turn is the owner of the Homestead Inn in Greenwich, a first class restaurant and bed and breakfast located in the Belle Haven section of Greenwich. He invested $116,666 cash in October, 1997 which money came from a bank account in the defendant's name. The defendant listed the asset on his financial affidavit at a market value of $116,666. CT Page 10106
The major asset in this marriage is Class A and Class B stock in Capital Group, Inc., the parent company of the defendant's current employer. The defendant first acquired Class A stock in 1975 and his last acquisition was in 1991. There are 40,500 shares of Class A stock registered in the defendant's name out of an outstanding issue of 4.8 million shares. Class A stock in Capital Group, Inc. is not publicly traded and is subject to a stock restriction agreement. Every purchaser of that stock must sign a stock restriction agreement before being allowed to make a purchase. Each month a value is placed on the Class A stock by Capital Group, Inc. The latest value presented at trial was on March 11, 1998, and is shown in Exhibit 4, a formula/price list. That formula has remained unchanged for over thirty years. Each share of Class A stock in Capital Group, Inc., according to Exhibit 4, as of March 11, 1998, is worth $279.18. Multiplied by the 40,500 shares owned by the defendant, the value of Class A stock in Capital Group, Inc., as of March 11, 1998, is $11,306,790.
The defendant also owns Class B stock in Capital Group, Inc. According to Exhibit 4 it has a value, as of March 11, 1998, of $156.18 per share. Class B shares are subject to a restricted stock agreement and are not publicly traded. The defendant currently owns 10,000 shares of Class B stock. He acquired all the Class B shares during the marriage. The last acquisition was a few years ago. The current value of the defendant's 10,000 shares of Class B stock in Capital Group, Inc. as of March 11, 1998, is $1,561,800.
The stock restrictions for the Class A stock are contained in the 39 page Exhibit 5. The stock restrictions for the Class B stock are contained in the 9 page Exhibit 6. At all times that the defendant has owned both classes of stock, they were subject to restrictions. The restrictions have remained unchanged since September 30, 1992. The defendant is permitted to sell his stock back to Capital Group, Inc. without restriction. He may either sell his stock in whole or in part, either Part A or Part B or both. He has never done so and has no intention of doing so.
According to the President of Capital Group, Inc., despite the fact that both classes have restrictions on their sale, if the corporation knew of a divorce and a "non-permissible owner" of the stock received ownership of the stock, Capital Group, Inc. would immediately redeem the stock for cash at the last assigned value. Only the employee/stockholder is defined as a "permissible CT Page 10107 owner", not the employee's spouse or ex-spouse. This cash purchase or buyout by Capital Group, Inc. would occur whether the stock was transferred by a separation agreement or a court decree after a contested trial. The corporation permits "non-permissible owners" to own stock for estate planning purposes without Capital Group, Inc. redeeming the stock. Despite this testimony, this court must review Exhibits 5 and 6 to determine if this restricted stock is "property" under Connecticut dissolution law.Krafick v. Krafick, 234 Conn. 783, 800 (1995).
After examination of the language of the restrictions, the testimony of the president, the redemption history of the stock and the three part test of Krafick v. Krafick, this court concludes that the restrictions do not prevent Class A and Class B stock in Capital Group, Inc. from being considered a present property interest for distribution. Bornemann v. Bornemann,245 Conn. 508, 518 (1998). Therefore, no coverture factor need to be applied concerning the distribution of either class of stock.
In further support of that conclusion is the fact that both Class A and Class B stock pay current dividends. The total dividends of both classes, paid to the defendant in 1997, was $1,111,000. A similar amount is disclosed on page 2, paragraph D of the defendant's February 24, 1998 financial affidavit. Quarterly dividends are regularly paid on the eighth day of January, March, June and September. In addition special dividends are declared twice a year. When the dividends are paid they become the defendant's property and there are no further restrictions on the use of those dividends. The $1,111,000 earned in 1997 was from the following dividends: January, 1997, $1.75 a share; March, 1997, $2.00; June, 1997, $2.00; September, 1997, $2.00; special dividend, March, 1997, $9.00; and special dividend, September, 1997, $5.00. In 1998, the first two quarterly dividends were paid as follows: January, 1998, $2.50, and March, 1998, $2.50. In March, 1998 a $9.00 special dividend was paid. The last day of trial occurred prior to the June, 1998 dividend date. The history of the dividends for both classes of Capital Group, Inc. stock indicate that payments will be continued in regular and increasing amounts.
The defendant has expressed no desire to sell his company stock. He does not intend to divest himself of the stock in the immediate future and there is no tax consequence if the transfer of stock occurs pursuant to a dissolution order. Powers v.Powers, 186 Conn. 8, 10 (1982); Hawkins v. Hawkins, CT Page 1010811 Conn. App. 195, 197 (1987). It is, therefore, not appropriate for the defendant to deduct capital gains taxes from the stock value in his financial affidavit.
The plaintiff testified that he may, in the future, use the stock for estate planning purposes, essentially to transfer a substantial portion of Capital Group, Inc. stock into a charitable trust. This would result in an immediate tax deduction, avoidance of estate taxes on the future appreciation of the stock and furnish current income. On the defendant's death, according to this proposed estate plan, the shares of stock would be owned by the charity. No details of this plan were offered in evidence.
The defendant owns 100,000 shares of Norwalk Savings Society stock (NSS). This stock has appreciated. If sold, the capital gains tax would be substantial. He has pledged 7,000 shares of NSS to Fordham University. His pledge letter is dated December 31, 1997. The stock has not yet been transferred but the pledge is disclosed in the liability section of his financial affidavit. He has given Fordham University significant donations each year. Because the recent growth in NSS stock, the value of the 7,000 shares is now $290,500. Once the final gift is made to Fordham University, the defendant would be left with 93,000 shares of NSS. His financial affidavit shows probable pledges of NSS stock to other charities of 2,200 shares. The defendant testified that, in his opinion, NSS is fully appreciated, but it is possible the value of the shares could increase if the bank was taken over.
The defendant is paid a base salary, and can earn a performance bonus, and special compensation. In 1997 his gross earnings were $3,476,513. His financial affidavit shows net 1997 income after payment of Federal, New York, Connecticut, Social Security and medicare taxes of $1,790,404. of this amount, his base salary was $348,000, and his performance bonus was $854,213. The performance bonus is based solely on the defendant's individual performance. He also received a special compensation package which is based on overall company results. In 1997, his special compensation package sum was $2,274,300. The performance bonus and special compensation package are paid in the following year to be included in the prior year's income. Thus, the two bonuses paid in 1998 are included in his 1997 taxable income. His earnings for 1997 increased over 1996. The earnings set forth in this paragraph did not include the Class A and B dividends. The plaintiff, wife is unemployed. CT Page 10109
The complaint is dated September 27, 1996. The first financial affidavit prepared by the defendant was dated March 31, 1997. The parties' assets were then $11,611,744. The current financial affidavits show assets in excess of $20,000,000. This substantial increase in assets is due to the increase in the value of investments, principally the increase in the value of stock in NSS and Capital Group, Inc. The major issue in this trial is, therefore, how to allocate that increase and the efforts regarding that increase.
This issue has not yet been decided by a Connecticut Appellate court. In 1973, General Statutes § 46b-81 created 18 separate criteria for the court to analyze in distributing property. The last sentence of § 46b-81(c) sets forth the criteria at issue in this case: "The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates."
The defendant husband claims it is his company stock, his labor and his twenty-five years of success with the company that contributed to the appreciation. He points to how high his performance bonus was and, therefore, the increase in the value of Capital Group, Inc. stock should be attributed solely to him. He says that the plaintiff made no efforts to increase the value of the company stock. It was soley his money and his investment skills that contributed to the purchase and holding of the NSS stock. He also testified that the parties were living separate and apart since March, 1997.
The wife on the other hand claims that Capital Group, Inc. is a holding company of which the defendant is only a minor employee, a senior vice president. Although he made a substantial amount of money and his contributions were rewarded by Capital Group, Inc., she argues that the stock did not increase mainly due to his contribution. The stock of Capital Group, Inc. and NSS increased due to the overall increase in the stock market. The plaintiff concludes her argument by stating that the contribution of each party to the acquisition, preservation and contribution in value of their respective estates due to a general market increase is a neutral factor. She claims that this "passive" increase in assets during the pendency of this case should not be ascribed to either party. CT Page 10110
The issue in this case is not related to what date the assets should be valued. The date of valuation of all assets in family matters is the date of the decree. Sunbury v. Sunbury,216 Conn. 673, 676 (1990). Neither party is arguing that the date of evaluation should be anything other than the date of dissolution. The issue is this case is whether or not the increase in value from the date of separation and/or date of commencement of this action to the date of the decree is to be attributed to one party. This issue does not violate the Sunbury rule. "In a dissolution action, marital property is valued as of the date of dissolution." Jackson v. Jackson, 17 Conn. App. 431, 435 (1989).
The full Sunbury rule also has an exceptional intervening circumstances exception which is not involved in the decision. "In the absence of any exceptional intervening circumstances occurring in the meantime, the date of the granting of the divorce would be the proper time at which to determine the value of the estate of the parties upon which to base the division of property" Sunbury v. Sunbury, supra, 216 Conn. 767.
There are no appellate cases discussing the contribution criteria. In Zern v. Zern, 15 Conn. App. 292, 296 (1988) the court held it was error to value assets as of the date of separation rather than the date of the decree, some two and one-half years' after the parties' separation. Presumably, the assets increased over that thirty month period, but this increase was not a factor in the Zern case. This issue was more carefully examined in an earlier case involving a twenty-six year separation prior to the contested dissolution. The Appellate Court approved considering the date of separation as appropriate for dissolution distribution, thereby permitting the husband wage-earner to keep the bulk of the twenty-six year asset acquisition and appreciation. Papageorge v. Papageorge,12 Conn. App. 596, 599-600 (1987). "The evidence in this case indicates that the bulk of the property owned by the plaintiff was acquired after his separation from the defendant and that the defendant played no role in either the acquisition or preservation of that property. Thus, the trial court's decision to award the defendant the only property the plaintiff possessed upon separation was clearly an exercise of lawful discretion."Papageorge v. Papageorge, supra, 12 Conn. App. 600.
This court, as a trial judge, did decide that a defendant husband solely contributed post separation to the appreciation of assets. Wendt v. Wendt, Superior Court, judicial district of CT Page 10111 Stamford-Norwalk at Stamford, Docket No. FA 96-0149562 S, (March 31, 1998 Tierney, J.) (1998 WL 161165 206, 216, 1998 Conn. Super Ct. LEXIS 1023 at 591-601. This court found that the defendant, Gary Wendt, was the CEO of GE Capital Corporation (GECC). GECC was the largest subsidary of it's parent corporation, General Electric Corporation and earned 40% of GE's profits. Mr. Wendt was entitled to claim that the appreciation in GE stock, since the date of the separation, was due partially to his efforts. This court recognized that the increase was also due to efforts of other GE employees but since the defendant, was such a high ranking employee, and his division was a large component of the massive increase, Mr. Wendt's argument should be given weight. The court found that there was no post separation contribution by the plaintiff and no minor children lived in the marital home. The Wendt court cited: Sunbury v. Sunbury, supra, 216 Conn. 673;Roach v. Roach, 20 Conn. App. 500, 507 (1990); Tobey v. Tobey,165 Conn. 742, 748-49 (1974); Cuneo v. Cuneo, 12 Conn. App. 702,709 (1982); Papageorge v. Papageorge, supra, 12 Conn. App. 600. Wendt was not a passive contribution case.
None of these cited cases come close to adopting the distinction of active/passive appreciation assets. New York adopted an active-passive concept in Price v Price, 511 N.Y.2d 219,69 N.Y.S.2d 8, 503 N.E.2d 684 (1986). New York replaced its existing divorce system with equitable distribution. It is based on the premise that a marriage is, among other things, an economic partnership to which both parties contribute as spouse, parent, wage earner or homemaker. O'Brien v. O'Brien, 66 N.Y.2d 576,585, 498 N.Y.S.2d 743, 489 N.E.2d 712 (1984). Both financial and non remunerated services were considered. The legislature defined "marital property" broadly and "separate property" narrowly. Majauskas v. Majauskas, 61 N.Y.2d 481, 489, 490,474 N.Y.S.2d 699, 463 N.E.2d 15 (1982). Domestic Relations Law § 236(B)[1](d)(3) defines an increase in value of separate property as separate property and increase in marital property as marital property. By reason of the broad interpretation ofMajauskas, Price excluded from the definition of separate property "increases in value, due, in part, to contributions or efforts of the nontitled spouse." Price v. Price, supra, 511 N.Y.S.2d 223. "We hold, therefore, that where separate property of one spouse has appreciated during the marriage and before execution of a separation agreement or commencement of a matrimonal proceeding and where such appreciation was due in part to the contributions or efforts of the nontitled spouse as parent or homemaker, the amount of that appreciation should be added to CT Page 10112 the sum of marital property for equitable distribution." Id., 224. Price concluded with the following phrase establishing the active-passive concept: "As a general rule, however, where the appreciation is not due, in any part, to the efforts of the titled spouse but to the efforts of others or to unrelated factors including inflation or other market forces, as in the case of a mutual fund, an investment in unimproved land, or in a work of art, the appreciation remains separate property, and the nontitled spouse has no claim to a share of the appreciation."Id., 225.
An example of a case in which this rule was applied and the husband' s efforts on behalf of a small company's appreciated stock was determined to be "active participation" is Hartog v.Hartog, 623 N.Y.S.2d 537, 540, 85 N.Y.2d 36, 637, N.E.2d 749 (1995). Prior to the marriage in Hartog, the husband was a substantial shareholder, officer and director in various family business corporations. His ownership interest varied between 25% and 50%. The businesses appreciated considerably in value during the marriage. The court found that the husband actively participated in these businesses and that the appreciation in the value of the family businesses should be partially attributed to his efforts.
In another case the husband as CEO was held to have actively participated in the growth of the company's stock held in an Employee Stock Ownership Plan and the court noted the "active" efforts of the husband in that appreciation. Greenwald v.Greenwald, 164 App.Div.2d 706, 565 N.Y.S.2d 484 (1st Dept. 1991).
The husband's active and direct involvement in high level corporate and investment decisions as a director and employee was sufficient to declare the husband an "active" participant in his company's stock appreciation. Heine v. Heine, 176 App.Div.2d 77,580. N.Y.S.2d 231, 237 (1st Dept. 1992).
Six days after the filing of the last brief by counsel in this case, the Appellate Court released its decision in Rolla v.Rolla, 48 Conn. App. 732 (1998). The trial court found that both parties had contributed equally to the accumulation and growth of their assets. This finding was based primarily on a document signed by the parties in 1986 or 1987. The parties then separated and lived apart thereafter. The document stated that in the event of a divorce, the wife would be entitled to half of his assets including the value of the companies with which he was then CT Page 10113 involved. Thereafter, the husband conveyed to the plaintiff title to the marital house and a commercial building which provided the wife with annual net rental income of $200,000. The parties were married in 1954 and had two adult children. Both were 64 at the time of trial. Neither party brought any property to the marriage. The husband became a lawyer shortly after the marriage. Although the wife's earning history was sporadic, 13 years were spent at home caring for the children. She had not been employed since 1987. The husband was financially successful acquiring, managing and disposing of companies. He was a "workaholic".
The parties after their separation and the execution of the document in 1986 or 1987 did not resume marital relations and in effect lived separate lives. At the time of the 1997 decree the husband had $14,000,000 in assets and the wife $4,000,000. The court ordered $5,000,000 to be conveyed to the wife so that each would have half of the total assets. There was no testimony of any contribution by the wife toward the growth of the husband's assets after their 1986 separation, upon which the court could have based a finding of equal contribution for those 10 years, 1987-1997. Nevertheless the Appellate Court upheld the trial court's findings and asset division.
Rolla gave the Appellate Court an opportunity to discuss the parties' relative contributions within the meaning of General Statutes § 46b-81.
 The defendant also claims that the trial court improperly determined that the assets to be distributed constituted all of the marital assets as of the date of dissolution. In support of this claim, the defendant points to the fact that the parties had functionally ceased to live as husband and wife in 1986 or 1987, dividing their financial holdings and going their separate ways at that time. The defendant also points to the plaintiff's lack of any contribution to the defendant's acquisition or growth in assets after the date of their separation. Accordingly, the defendant argues that, since the plaintiff did not contribute in any way, monetarily or nonmonetarily, to the acquisition, preservation or appreciation in value of the assets of the marital estate, she is not entitled to share in any assets acquired after that date or in the appreciation after that date of any previously acquired assets.
Rolla v. Rolla, supra, 48 Conn. App. 743-44. CT Page 10114
The Rolla court applied the valuation rule of Sunbury v.Sunbury, supra, 216 Conn. 676, and stated: "The extent to which the efforts of one spouse may have led to an increase in value of property without any monetary or nonmonetary contribution by the other spouse after the parties' separation should be taken into account by the trial court in determining the division of property incident to a dissolution of marriage action. Zern v.Zern, supra, 15 Conn. App. 296." Rolla v. Rolla, supra,48 Conn. App. 744-45. The defendant's above quoted arguments were overruled by the Appellate Court which stated "the mere increase in value of property following the parties; separation does not rise to the level of exceptional intervening circumstances". Id., 745.
Rolla is a foundation upon which Connecticut can build an active/passive analytical structure. under the facts of this case, despite the financial success of the defendant, this court finds that the appreciation of the assets from $11,000,000 to $20,000,000 during the pendency of this matter is largely due to market forces beyond the control of either party. Although Connecticut has no concept of marital/separate property, the appreciated assets are property for dissolution distribution purposes. Krafick v. Krafick, supra, 234 Conn. 800. The appreciation of the assets since the parties' separation is "passive" and the entire appreciation is property for dissolution distribution purposes.
 ORDER
The court has carefully considered the criteria set forth in General Statutes §§ 46b-56, 46b-62, 46b-66, 46b-81, 46b-82 and46b-84 as well as O'Neill v. O'Neill, 13 Conn. App. 300 (1988), in reaching the decisions reflected in the orders that follow.
The court enters the follows orders:
1. The decree dissolving the marriage on the grounds of irretrievable breakdown may enter.
2. The parties are awarded joint custody of the minor child. The child's primary residence shall be with the plaintiff subject to the defendant's right of reasonable and liberal visitation.
3. The plaintiff shall receive as her property, free and clear CT Page 10115 of any claim by the plaintiff, all right, title and interest in and to the real property at 246 Brookside Road, Darien, Connecticut. The defendant shall pay off the existing mortgage and record a release of that mortgage. He shall hold the plaintiff harmless therefrom. He shall pay the mortgage on a current basis and provide proof thereof to the plaintiff. The outstanding mortgage and accrued interest shall be paid in full on October 1, 1999 or upon the sale of the premises by the plaintiff, whichever event first occurs. The plaintiff shall pay for all other expenses regarding said real property, from the date of this decree and hold the defendant harmless therefrom.
4. The defendant shall receive as his property, free and clear of any claim by the plaintiff, all right, title and interest in and to the real property at 1 Getner Trail, Norwalk Connecticut.
5. The defendant shall receive as his property, free and clear of any claim by the plaintiff all right, title and interest in and to the real property at 7 Old Harbor Lane, Chatham, Massachusetts. The defendant shall pay for all expenses regarding said real property, from the date of this decree and hold the plaintiff harmless therefrom.
6. The plaintiff shall continue to own all the right, title and interest in and to the trust created by her grandmother and the trust created by her father and any assets that may be distributed or paid from these trusts, free and clear of any claim by the defendant.
7. The court finds upon an examination of the plaintiff's financial affidavit and testimony related thereto, that the plaintiff's expenses are $25,725 monthly. This issue includes the cost of maintenance of the marital home in Darien which is currently encumbered by a mortgage. The existing first mortgage has been ordered to be paid by the defendant. When the mortgage is paid by the defendant, the maintenance cost of the marital house will decrease. The plaintiff will also no longer pay for the Chatham, Massachusetts house expenses. The plaintiff's expenses then will be $16,000 per month. The defendant has sufficient income to be able to pay to the plaintiff periodic alimony to meet her stated expenses, as well as additional income taxes on said alimony. Alimony is not limited by a person's needs. Simmons v. Simmons, CT Page 10116244 Conn. 158, 181 (1998). The defendant shall pay to the plaintiff $25,000 per month as periodic alimony, commencing on October 1, 1998, to terminate upon the death of the plaintiff, the death of the defendant, the remarriage of the wife or September 30, 2008, whichever event first occurs. On September 30, 2008 the defendant will then be 65 when his duties with his current employer will phase out. The plaintiff, in the interim, has the ability to increase her assets so that the loss of periodic alimony can be replaced by earnings on invested assets, and receipt of the QDRO ordered retirement funds. Ippolito v. Ippolito,28 Conn. App. 745, 753 (1992), cert. denied, 224 Conn. 905.
8. The defendant shall pay to the plaintiff no child support in light of his obligation to pay the medical and education expenses of the minor child. The plaintiff shall be entitled to the minor child's income tax exception.
9. The defendant is awarded all the right, title and interest in and to the membership in the Wee Burn Country Club, Darien, Connecticut. He shall cooperate with the plaintiff's application to join as an individual member of the Wee Burn Country Club. In the event that there is any cost for the plaintiff's application and joining including application fee, investigation fee, bond, initiation fee, and/or assessment fee the defendant will pay said sum when due. Thereafter, the plaintiff shall pay all membership dues, assessments, fees and expenses.
10. The defendant will pay for and hold the plaintiff harmless from the note due on the children's trust in the amount of $520,000. The court will retain continuing jurisdiction over the terms and conditions of any said documents necessary to put this order into effect.
11. The court finds that the balance on deposit in the U.S. Trust Company Money Management account of $1,373,766 is 1997 income. Although it is included as an asset and divided as an asset, it is in effect income since it largely consists of the 1997 performance bonus paid at the beginning of 1998 in a lump sum. The defendant is awarded the entire U.S. Trust Company Money Management account together with accrued interest.
12. The plaintiff will execute all amended tax returns for the year 1997 prepared by the defendant. In the event the plaintiff refuses to execute said amended tax returns, this court CT Page 10117 will retain continuing jurisdiction to reallocate the assets of the parties to reflect the financial results of the failure of the plaintiff to execute the amended 1997 tax returns.
13. The defendant will hold the plaintiff harmless for any and all claims, demands, expenses, liens and obligations arising out of all joint tax returns for any year, including 1997 and any 1997 amended tax returns. All refunds shall be the defendant's property.
14. The defendant is awarded all right, title and interest in and to the following assets.
a) Limited partnership interest in Homestead Associates, LLC
 b) One half of the American Funds Cash Management Trust of America
 c) Seventy Five (75%) percent of the Norwalk Savings Society stock and any exchange rights for said stock, after the distribution of the 9,200 shares of Norwalk Savings Society previously pledged.
 d) All shares in After Market Technologies (ATAC) including the obligation to pay for and hold the plaintiff harmless from all margin debt on said holdings.
e) The following automobiles:
1. 1977 Jaguar
2. 1998 Jaguar
3. 1995 Ford Mustang
4. 1998 Mercedes 190
5. 1998 Mercedes E430
6. 1998 BMW 540
f) 1989 14 foot Boston Whaler boat
g) 1989 21 foot Padebco boat
 h) One-half of the three American Mutual Funds shown in the CT Page 10118 plaintiff's financial affidavit
i) U.S. Trust Company checking account (joint names)
15. The plaintiff is awarded all the right, title and interest in and to the following assets:
 a) One-half of the American Funds Cash Management Trust of America
 b) Twenty Five (25%) percent of the Norwalk Savings Society stock and any exchange rights for said stock, after distribution of the 9,200 shares of Norwalk Savings Society previously pledged.
c) The following automobiles
1. 1991 Saab 900 Turbo
2. 1988 Saab Convertible
3. 1991 Ford Explorer
 d) One half of three American Funds accounts shown in the plaintiff's financial affidavit
e) 16 foot sail boat
f) Lafayette American Bank checking account.
16. The defendant shall retain record ownership of all shares of Capital Group, Inc., Class A and Class B stock. The plaintiff shall receive, upon receipt by the defendant, one-half of any dividends paid on either class of stock and one-half of any amounts paid to the defendant as a result of the sale, redemption or other disposition of either or both classes of said stock. If the stock in Capital Group is exchanged for securities in any other corporation or a share of any other business entity, the plaintiff shall be entitled to the same financial benefits as she would have received if said exchange had not taken place. The payment of an amount equal to one-half of the taxable dividend received by the defendant with respect to the shares of said stock shall be paid to the plaintiff as alimony deductible by the defendant until the plaintiff's death but irrespective of his death or her remarriage. Said payments shall be taxable to the plaintiff only if the CT Page 10119 receipt of said dividend is taxable to the defendant. Any proceeds received by the defendant from the sale, redemption or other disposition of his said stock shall be a property settlement divided equally between the parties after payment of all capital gains or other taxes incurred in connection with said distribution.
17. The Capital Group Master Retirement Plan, the Supplemental Employee Retirement Plan, as well as all IRAs shall be divided equally between the parties. To the extent necessary, a Qualified Domestic Relations Order (QDRO) shall enter to provide the plaintiff with her share of any such retirement account. The court will retain continuing jurisdiction as to the terms and conditions of any QDRO.
18. The parties have agreed among themselves to divide their furniture, personal property and bric-a-brac wherever located. This court will retain continuing jurisdiction over any division of personal property.
19. Each party will pay for his or her own attorney's fees.
20. Each party will pay for and hold the other party harmless for any and all liabilities listed in his or her respective financial affidavits.
21. The defendant shall pay all charitable pledges made by him, with or without the plaintiff's consent, which pledges are shown in his financial affidavit. Written proof of said payment shall be furnished to the plaintiff. The defendant should be entitled to all tax deductions for pledges actually paid. If the gifts of the 9200 shares of Norwalk Savings Society (NSS) stock or its successor are not made by December 31, 1998, said ungifted portion of NSS or its successor shall be divided equally between the parties.
22. The defendant shall cooperate with the plaintiff in obtaining all COBRA and/or OBRA benefits through an insurance company and/or HMO as the case may be, to the extent permitted by law. The plaintiff shall pay all premiums therefore.
23. The defendant shall provide and pay for medical, hospitalization and dental insurance coverage for the minor child. Any uninsured medical, dental hospital and psychological expenses for the minor child shall be paid for by the defendant. CT Page 10120 The defendant's obligation in this paragraph shall extend until the child graduates from college.
24. Both parties have included in their written claims for relief, the request that this court order the defendant to pay for the minor child's secondary and post secondary education costs in lieu of child support. This court is of the opinion that such mutual written claims for relief comply with General Statutes § 46b-66. The defendant shall pay all tuition, room and board, books, fees and supplies for the private boarding school education of the minor child including those beyond the age of minority. The defendant shall pay for all tuition, room, and board, books, fees and supplies for any post secondary education of the child beyond the age of minority, including, but not limited, to undergraduate college and graduate school.
25. The defendant shall maintain the plaintiff as the permanent beneficiary of life insurance on his life in the amount of $550,000. He is currently insured by a group life insurance policy issued through Capital Group, Inc. and a $193,820 policy issued by Northwestern Mutual Life Insurance Company. The defendant shall pay all premiums therefore and shall not pledge, borrow against, hypothecate or otherwise encumber said policies. This order is security for payment of alimony. The defendant's obligation to maintain said $550,000 of said life insurance coverage will terminate when the obligation of the defendant to pay periodic alimony pursuant to paragraph 7 of this order terminates. The defendant shall provide written proof of compliance with the life insurance order upon the written request of the plaintiff, no more than twice per calendar year.
26. The plaintiff and defendant shall retain all assets listed in their respective financial affidavits submitted to court except as above noted.
27. Each party shall sign all documents and produce all records and information necessary to put into effect the orders of this court.
28. The plaintiff's counsel shall prepare the judgment file and Qualified Domestic Relations
Orders for approval and signature by defendant's counsel.
CT Page 10121 BY THE COURT,
KEVIN TIERNEY, JUDGE